of the impression that upon his death his widow would become owner in the entirety of the parcels of real estate mentioned.  Under such circumstances it seems clear beyond doubt that the testator intended that his widow should have all of his property, and that he did not intend any part of it to pass to his heirs by intestacy or in any way. Furthermore, quite irrespective of the special circumstances appearing in this will and showing clearly the testator's intention that the testamentary gift to his wife was intended to embrace all his property, it would be a dangerous doctrine to introduce that, if it could be shown that a testator possessed certain property that he was not aware that he possessed, it could be held that such property was not embraced in a general devise or bequest, but that he died intestate as to such property.

The conclusion I reach upon the construction of the will renders it unnecessary to discuss the question whether or not under the deeds the interest of the husband in the property terminated with his death. There should be judgment for the defendants, dismissing the complaint upon the merits, with costs.  The requests for findings of the respective parties have been passed upon as indicated upon the margins thereof.  Submit for my signature, upon two days' notice of presentation, a decision embodying all findings made by me, with proof of service on the other side.

---

(173 App. Div. 739)

## In re DOUBLEDAY et al.

(Supreme Court, Appellate Division, Third Department.　June 30, 1916.)

1. EXECUTORS AND ADMINISTRATORS ⊂⇒221(5)—CLAIM AGAINST ESTATE—SUFFICIENCY OF EVIDENCE.

Evidence on a claim against an estate for table board, rental and care of room, washing and mending, care and nursing of deceased, cash advanced for necessaries, a note and the board of two guests, amounting, less the credits, to $3,374.54, *held* not to show that deceased had obligated himself to pay the amounts in dispute.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 903½, 1874, 1876; Dec. Dig. ⊂⇒221(5).]

2. INNKEEPERS ⊂⇒8—"BOARD"—"BOARDER"—"GUEST."

To "board" is "to receive food as a lodger or without lodging for a reasonable compensation"; a "boarder" is one who has food or diet and lodging in another's family for reward or for a stipulated price; and a "guest" is a transient person, who resorts to, and is received at, an inn for the purpose of obtaining the accommodations which it purports to afford.

[Ed. Note.—For other cases, see Innkeepers, Cent. Dig. § 7; Dec. Dig. ⊂⇒8.

For other definitions, see Words and Phrases, First and Second Series, Board; Boarder; Guest.]

Kellogg, P. J., and Howard, J., dissenting.

Appeal from Surrogate's Court, Otsego County.

In the matter of the judicial settlement of the accounts of James C. Doubleday and Clarence B. Platner, as administrators of the estate of

James D. Clyde, deceased. From a decree of the Surrogate's Court (In re Clyde's Estate, 155 N. Y. Supp. 621) awarding a claim of Julia L. Sutliff for $1,334.50, the administrators appeal. Reversed.

Argued before KELLOGG, P. J., and LYON, HOWARD, WOODWARD, and COCHRANE, JJ.

S. Mack Smith, of Binghamton, for appellants.

Barnum Bros., of Cherry Valley (S. W. Barnum, of Cherry Valley, of counsel), for respondent.

WOODWARD, J. Julia L. Sutliff presented a claim to the administrators of the estate of James D. Clyde, deceased, for the sum of $3,374.54, with interest on $400 of this amount from January 29, 1912; this claim being based upon eight different items. This claim was duly rejected by the administrators, and a stipulation was made that it might be heard on the final accounting. Passing over the matters of practice, the administrators petitioned for the judicial settlement of their account, and an answer, filed in behalf of the claimant, set up that the personal property belonging to the estate was insufficient for the payment of the just demands and charges against the estate, and asked that the administrators be required to mortgage, lease, or sell the real estate owned by decedent for the payment of such demands and charges. Upon the trial of the claimant's claim, which as made to the administrators alleged that the deceased was indebted to the claimant for table board at the agreed price of $3.50 per week, the learned surrogate permitted an amendment to the effect that "such table board was worth at the rate of $3.50 per week," thus opening the way around the provisions of section 829 of the Code of Civil Procedure. The trial resulted in an allowance of the claim to the extent of $1,334.50, and a decree directing the administrators to dispose of the real estate for the purpose of discharging this obligation. The administrators appeal from so much of the decree as allows the sum last above mentioned to the claimant.

The claim, as presented, was: First, table board, January 1, 1897, to April 1, 1904, 378 weeks, at the agreed price of $3.50 per week, $1,323; second, table board at agreed price of $3.50 per week, and rental and care of room, washing, and mending, worth $1.50 per week, from April 1, 1904, to December 4, 1913, less 7 weeks' absence in 1907, in all 496 weeks, at $5 per week, $2,480; third, extra labor caring for decedent during illness from June 1, 1907, to April 1, 1913, in all 70 months, reasonably worth $10 per month, $700; fourth, care and nursing of decedent night and day during 6 months of his last illness, reasonably worth $25 per week, 26 weeks, $650; fifth, assisting in care of decedent during 8 weeks of his last illness, reasonably worth $10 per week, $80; sixth, cash advanced for necessaries during his last illness, $25.33; seventh, promissory note, $400 and interest from January 29, 1912, interest having been paid by decedent to that date; eighth, board of two guests, 10 weeks each, and one guest, 8 weeks, in all 28 weeks, at $3.50 per week, $98—a total of $5,756.33. On this latter amount the claimant admitted credits amounting to $2,381.79, leaving a balance claimed of $3,374.54.

The learned surrogate held that this claim, in so far as it accrued prior to the 4th day of December, 1907, with the exception of the promissory note, was barred by the statute of limitations, so that all of the first item of the claim is eliminated from the controversy, and with it all question as to the justification for the amendment by alleging the value of the board in place of the agreed price. And the same is true of a considerable part of the second item.

[1, 2] It appears from the account submitted by the claimant that, beginning with the 12th day of November, 1907, and continuing throughout the balance of his life, Dr. Clyde changed the policy of paying in groceries, taxes, etc., and made cash payments, which appear to aggregate substantially the amount of the board at the agreed price, many of the items being the exact amount of the board for the intervals of time between payments, and it is very evident, from the claimant's own showing, that Dr. Clyde intended to and did pay his board in the agreed amount of $3.50 during his lifetime, and the only excuse for making the claim for board was to give some sort of foundation for the testimony as to the other items making up the claim. Starting with the conceded fact that Dr. Clyde had boarded with the claimant's mother and with the claimant for a long term of years; that Dr. Clyde had been in a measure a member of the claimant's family since she was a girl of 10 years of age, and it was comparatively easy to get neighbors and relatives to testify in a general way to little acts of courtesy, such as helping Dr. Clyde to put on his coat, assisting him to get up stairs, raising the clothesline to permit him to pass under, with some references to washings, etc., due to his lack of control over his bowels and urinary organs, and to draw the inference that these services were continuous during the periods for which the claim was made, and it is upon this class of evidence that this claim has been approved.

With the fact out of the case that Dr. Clyde had been a boarder in the claimant's family for many years, paying his board with comparative regularity, as clearly appears from the evidence supplied by the claimant's own account, there would be no evidence worthy of consideration to support the great bulk of the claim, and the obvious purpose of including all of these items in reference to table board was for the purpose of giving a background for these claims which were never asserted during the lifetime of Dr. Clyde. For years, according to the claimant's account, Dr. Clyde had been boarding and rooming with the claimant, and during all of that time he had been making payments which appear to have covered practically the amount of the board at $3.50 per week, and now his estate is being charged with $1,334.50, on the theory of an implied promise to pay for room rent and alleged services, with no evidence which could support such a conclusion, except as it is woven in with the admitted fact that the deceased boarded at the claimant's house. Why he should have religiously paid his board from away back in 1870 down to the very week of his death, and yet have permitted his room rent and caretaking to be entirely in arrears, is not suggested, and while there is the testimony of a neighbor that at some time Dr. Clyde occupied his

own house and took his meals at the claimant's, and it appears that he subsequently occupied a room in the claimant's house, there is no evidence to show that there was any understanding, expressed or implied, that there should be any larger charge for the board and lodging, or, indeed, that the board and lodging was not included in the price which Dr. Clyde paid. The evidence does not show the price paid for table board prior to Dr. Clyde occupying the room in the claimant's house, and while $3.50 per week might seem a very small price for board and lodging, it is to be remembered that this transaction took place in a small community, and the prices fixed in 1870 and continued along to the time of the death of Dr. Clyde, might not have been anything out of the ordinary course of events in such a community.

It is a significant fact that in the eighth item of this claim, without any dates, the claimant makes a charge for "two guests, 10 weeks, and one guest, eight weeks, board at $3.50 per week," and there is nothing to indicate that these guests did not occupy rooms in the claimant's house, becoming boarders. "Board" is defined as "to receive food as a lodger, or without lodgings, for a compensation" (Pollock v. Landis, 36 Iowa, 651, 652), and "boarder" is defined as "one who has food or diet and lodging in another's family for reward; one who has food and lodging in another's house or family for a stipulated price" (5 Cyc. 718). The claimant chose her own language and she describes these people as guests, and a guest, in contemplation of law, is a transient person who resorts to, and is received at, an inn for the purpose of obtaining the accommodations which it purports to afford. 16 Am. & Eng. Ency. of Law, 516, and authorities cited in note. The claimant conducted a boarding house, and she claims from Dr. Clyde's estate for the board of guests at $3.50 per week, and, in the absence of limiting words, we must conclude that her rate for guests was $3.50 per week for their entertainment, including lodging. No good reason suggests itself, except that Dr. Clyde is dead and cannot resist the claim, why his estate should be charged for board and lodging more than other guests of the claimant—more than her regular price. It is suggested, of course, that Dr. Clyde had relatives who did nothing for him in his declining years; but he appears to have been a man of some means, abundantly able to take care of himself, and he likewise appears to have discharged his obligations to the claimant regularly, so far as there was any substantial foundation for them, and now that he has passed beyond the vale is no reason why the court should undertake to administer abstract justice as between the claimant and the heirs of the deceased.

It may be conceded that the evidence tends to support the claim for board of the deceased at $3.50 per week, but it is equally clear, from the claimant's admissions in the record, that Dr. Clyde paid his board right up to the very week of his death, his administrators satisfying the demand for the final week; and the effort to hitch onto this legitimate transaction the claims made for alleged room rent and care is not free from that suspicion which justly attaches to claims extending over a long period of time and which remain unasserted until after

the death of the person who is alleged to have incurred the obligation. There are, undoubtedly, some considerations of natural justice which would have warranted Dr. Clyde in providing a larger compensation to the claimant; but the record before us does not justify the conclusion that there was any expressed or implied contract or promise on his part to pay for the alleged services which were undoubtedly rendered in the performance of those good offices which a landlady of long years of association with a boarder would be prompted to make in his old age.

The authorities are uniformly against the claimant in this matter; public policy demands that the estates of deceased persons shall not be raided by persons claiming that which they have never asserted in any manner during the lifetime of the deceased. Matter of Dole, 168 App. Div. 253, 255, 153 N. Y. Supp. 895; Kearney v. McKeon, 85 N. Y. 136; Matter of Van Slooten v. Wheeler, 140 N. Y. 624, 35 N. E. 583; Porter v. Rhoades, 48 App. Div. 635, 63 N. Y. Supp. 112; Forbes v. Chichester, 8 N. Y. Supp. 747.[1]

The decree, in so far as appealed from, should be reversed. All concur, except KELLOGG, P. J., and HOWARD, J., who dissent.

---

(173 App. Div. 473)

## In re LYON.

## In re MERRITT'S WILL.

(Supreme Court, Appellate Division, Second Department.    June 23, 1916.)

1. CHARITIES ⊙25—CHARITABLE TRUSTS—MAINTENANCE OF CEMETERY.
   Under Personal Property Law (Consol. Laws, c. 41) § 13a, and Real Property Law (Consol. Law, c. 50) § 114a, relating to private burial lots and trusts for their maintenance, where the testator sought to provide for the creation and maintenance of a public cemetery, but the trust failed because his title to the property devised was declared fraudulently obtained, the trust was nevertheless good as to the family lot provided by the same will.

   [Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 11–13; Dec. Dig. ⊙25.]

2. CHARITIES ⊙25—CHARITABLE TRUSTS—MAINTENANCE OF CEMETERY—DUTIES OF TRUSTEES.
   Where the intended charitable trust for the maintenance of a public cemetery failed because testator's title to the property devised was declared fraudulently obtained, but a portion of the fund devised actually belonged to testator, the trustees were under the duty of expending such sum for the purpose directed in the will.

   [Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 11–13; Dec. Dig. ⊙25.]

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 55 Hun, 611.

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes